## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**DAVID ADAM BLACK,**

      **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 3:19-CV-00680**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered September 23, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 15); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, David Adam Black, (hereinafter referred to as "Claimant"), protectively filed his applications for benefits on June 28, 2016, alleging disability since June 30, 2015[1], because of back problems and heart burn. (Tr. at 407, 408, 465) His claims were initially denied on October 24, 2016 (Tr. at 326-331) and again upon reconsideration on January 4, 2017. (Tr. at 339-344) Thereafter, Claimant filed a written request for hearing on January 13, 2017. (Tr. at 345-349)

An administrative hearing was held on August 14, 2018 before the Honorable Neil Morholt, Administrative Law Judge ("ALJ"). (Tr. at 48-90) On September 28, 2018, the ALJ entered an unfavorable decision. (Tr. at 19-47) On November 15, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 403) The ALJ's decision became the final decision of the Commissioner on August 28, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On September 19, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16). Consequently, this matter is fully briefed and ready for resolution.

---

[1] Although Claimant testified his disability began on June 30, 2015 because he could "feel his re-herniation starting to get bigger" and that he began to have more pain and need to take more pain pills than necessary (Tr. at 59), in his application for benefits, he asserted that he stopped working "[b]ecause of other reasons" and that his "hours got lowered due to a contract dispute, and I was not making enough money so I quit and went on unemployment." (Tr. at 465)

**Claimant's Background**

Claimant was 36 years old as of the alleged onset date, and defined as a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 37) Claimant has a high school education. (Tr. at 466) Claimant worked as a tractor-trailer driver since 2003 until he stopped working in 2015. (Tr. at 58-59)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a).  First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).  Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more

4

information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2020. (Tr. at 25, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since June 30, 2015, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine with radiculopathy, as well as of the cervical spine; osteoarthritis; degenerative joint disease (including trochanteric bursitis of the hips); polysubstance abuse (i.e. methamphetamine use disorder, in remission); anxiety; and depression. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except he can:

> sit for six hours out of an eight-hour workday; stand for four hours out of an eight-hour workday; and walk for four hours out of an eight-hour workday. He can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. He can frequently balance, but only occasionally stoop, kneel, crouch, and craw[l]. He can frequently use hand and foot controls, and frequently handle and finger bilaterally. He can occasionally reach overhead bilaterally. He can frequently push/pull bilaterally with both the upper and lower extremities. He must use a cane to ambulate. He should avoid frequent exposure to extreme cold, extreme heat, dusts, fumes, odors, gases, and other pulmonary irritants, unprotected heights and moving mechanical parts. He retains the ability to: understand, remember and carry out simple routine tasks; make simple work-related decisions; and frequently

interact with supervisors, coworkers and the general public.

(Tr. at 27-28, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 36, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ then determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Tr. at 37, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from June 30, 2015 through the date of the decision. (Tr. at 38, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that that the ALJ erred in several respects: (1) that he failed to consider his treating physicians' opinions with regard to how Claimant's pain adversely affected his activities of daily living and other functioning; (2) that the ALJ substituted his opinion for that of Claimant's treating providers; (3) that the ALJ failed to consider Claimants pain as well as the numbness in his hands that would erode the job based in both light and sedentary categories; (4) that the ALJ failed to conduct a proper credibility analysis; (5) that the ALJ failed to consider the combination of Claimant's impairments which precluded Claimant from performing substantial gainful activity; (6) and that the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (ECF No. 15 at 15-20) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 20)

In response, the Commissioner asserts that the ALJ thoroughly considered Claimant's medical records dating as far back as 2007 and through the relevant period that encompassed diagnostic and examination findings, Claimant's subjective complaints, his medications,

recommended treatment, and opinion evidence, none of which deemed Claimant disabled, and from all the relevant evidence, the ALJ rendered a decision supported by substantial evidence. (ECF No. 16 at 8-11) Regarding Claimant's argument that the ALJ failed to consider his treating physician's opinion, the Commissioner points out that none of what Claimant references are considered opinions to be weighed under the Regulations, but are actually Claimant's own reports documented by his physician. (Id. at 11-12) Also, Claimant's reliance on outdated credibility analyses lacks merit and inapplicable to the case at bar. (Id. at 12)

The Commissioner also contends that contrary to Claimant's assertions, the ALJ thoroughly and repeatedly considered his pain symptoms throughout his analysis, and that Claimant cites to only one piece of evidence in the record to support this assertion that was not even before the ALJ, but was submitted to the Appeals Council. (Id. at 13-14) Regardless, Claimant offered no argument as to how this evidence should be considered under the governing Regulations or sentence six, thus waiving the issue. (Id. at 14)

Further, concerning the combination of effects from his impairments, again, Claimant neither explains how the ALJ erred nor identifies which particular Listing his combination of impairments meets or medically equals; nevertheless, the ALJ did consider the combined effects of Claimant's impairments because he specifically found they did not meet or medically equal any Listing, and there is no evidence suggesting the ALJ neglected to do this. (Id. at 15-16) The Commissioner argues that the ALJ accounted for all Claimant's credibly established functional limitations from both his severe and non-severe impairments in the RFC finding and there is no opinion on record that Claimant had greater restrictions than found by the ALJ. (Id. at 16-17)

Finally, the Commissioner points out there is no presumption of disability and that

substantial evidence supported the ALJ's decision and asks this Court to affirm. (Id. at 17-19)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Mental Health Records:

Claimant sought treatment at Prestera Center on November 23, 2016. (Tr. at 705-710) He admitted to taking stimulants daily, and assessed at his intake with substance abuse of methamphetamines with last using on October 23, 2016. (Tr. at 710)

Claimant returned to the Prestera Center on December 29, 2016. (Tr. at 1242-1247) He was diagnosed with severe amphetamine-type substance stimulant use disorder, severe cannabis use disorder, generalized anxiety disorder, moderate alcohol use disorder, and parent-child relational problem, among other issues. (Tr. at 1244) The treatment plan was to begin individual psychotherapy and begin Zoloft. (Tr. at 1246)

He returned for therapy on January 26, 2017. (Tr. at 1248-1253) The diagnoses and treatment plan remained the same although additional diagnoses of adult physical abuse by nonspouse or nonpartner, personal history of physical and sexual abuse in childhood, medical illness, unspecified problems related to employment and problem related to housing and economic

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings, with exception to those records referenced in Claimant's brief that were not before the ALJ for consideration, but submitted to the Appeals Council at least seven months after the ALJ issued his decision. As noted by the Commissioner, pursuant to the Regulations, a claimant bears the responsibility to inform the ALJ or otherwise submit all evidence no later than five business days before the hearing. See 20 C.F.R. §§ 404.935, 416.1435. (ECF No. 16 at 12, n.4) The only two outstanding records Claimant's counsel informed the ALJ of were already included in the record before him, and Claimant's counsel did not advise of any additional outstanding records. (Tr. at 52-53) Further, Claimant makes no argument that any of the additional evidence submitted after the hearing (i.e. Tr. at 91-279) warrants consideration under 20 C.F.R. §§ 404.935, 404.970 or sentence six pursuant to 42 U.S.C. § 405(g). Accordingly, to that extent, any such argument pertaining to that issue has been waived. Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (reviewing court will generally not address arguments not raised in opening brief).

circumstances were added and Zoloft was increased to 100 mg daily. (Tr. at 1251-1252)

Claimant returned for therapy on March 9, 2017, May 5, 2017, June 29, 2017, and August 29, 2017, all therapy visits addressed the same diagnoses with psychotherapy and beginning trazodone, and increasing Zoloft and Buspar. (Tr. at 1254-1277)

On March 20, 2018, Claimant sought treatment at Marshall Psychiatry and Behavioral Medicine from Brandon Lilly, M.D. (Tr. at 1372-1377) He presented for evaluation of anxiety and a history of methamphetamine use. (Tr. at 1372) It was noted that Claimant had a history of anxiety and panic and had been sober since 2016. (Id.) Claimant reported one panic attack a week which could last up to an hour. (Id.) Dr. Lilly prescribed Lexapro and continued Trazodone and Vistaril. (Tr. at 1377)

Medical Records Related to Physical Impairments:

The record reflects a history of back pain that predates the relevant period. In 2007, eight years prior to the relevant period, Claimant had a herniated disc in his lumbar spine, underwent surgery, and returned to work. (Tr. at 582-618) In late May 2015, Claimant underwent treatment following a motorcycle accident during which he injured his left ribs. (Tr. at 645-648) The record does not contain further treatment for this injury after June 2015.

On November 3, 2015, Claimant sought treatment at Primary Care Nitro from Becky Dempsey FNP-BC for lower back pain. (Tr. at 623-624) He reported that the pain was intermittent and brought on by lifting a heavy object and sitting; he stated that the pain was aggravated by daily activities and he had chronic pain for years. (Tr. at 623) Claimant had tenderness in his lumbar spine and was diagnosed with low back pain with sciatica and prescribed medication. (Tr. at 626) He was also encouraged to exercise and maintain his weight. (Id.)

10

E. Michael Robie, D.O., at Primary Care Nitro saw Claimant again on April 6, 2016 for pain management. (Tr. at 619) Claimant located the pain in the lower back, radiating to both thighs, and described it as persistent, aching and burning, and aggravated by standing and walking. (Id.) Claimant also complained of a knot on his right shoulder and pain with movement. (Id.) Dr. Robie assessed bilateral low back pain with sciatica laterality unspecified; dorsalgia, unspecified; and acute pain of right shoulder; he ordered further diagnostic evaluations of the shoulder. (Tr. at 621)

Claimant attended a consultative examination by Joan Crennan, M.D., in September 2016. (Tr. at 632-637) He presented with chief complaints of low back pain and heartburn. (Tr. at 632) He reported that he was not on any medication for his pain and denied a significant history of drug use. (Tr. at 633) On examination, Claimant walked with a normal gait, did not use an assistive device, and was comfortable in the seated and supine positions. (Id.) He had good recent and remote memory and no noted neck abnormalities. (Tr. at 633-634) He had tenderness over the right shoulder with pain on motion, but had relatively normal motion as he had 180 degrees of flexion in both shoulders, 160 degrees of abduction in the right shoulder, and internal rotation to 70 degrees and external rotation to 90 degrees in both shoulders. (Tr. at 634) Claimant could make a fist and displayed full 5/5 strength in both hands with no tenderness or atrophy. (Id.) He had a benign lower extremity exam, popping and pain on range of motion of the shoulder, mild tenderness in his lumbar spine, a negative straight leg raising test, full 5/5 strength in his upper and lower extremities, and no atrophy. (Tr. at 635) Dr. Crennan diagnosed Claimant with low back pain being treated conservatively, controlled gastroesophageal reflux disease, and chronic right shoulder pain (ruled out AC separation and/or osteoarthritis). (Id.)

On November 16, 2016, Claimant reported to Charleston Area Medical Center (CAMC)

AMB Primary Care Nitro with complaints of pain in back and shoulders. (Tr. at 1146-1149) He had "knots" on the knuckles of his left hand, and reported that they were sore and achy and he could not make a fist. (Tr. at 1147) He also was having lumbar pain which radiated down both legs, which was getting worse. (Id.) Claimant requested an MRI and a referral to Dr. Panos Ignatiadis, who previously performed lumbar surgery on him. (Id.) Claimant also complained of pain in his neck and right shoulder with "bone protruding" and no injury. (Id.) He was assessed with lumbar pain with radiation down both legs, and right shoulder pain; his prescription for Neurontin was increased and diclofenac was added (Tr. at 1148) An MRI of his lumbar spine and x-rays of his right shoulder were ordered. (Id.) A November 17, 2016 x-ray of Claimant's shoulder was a normal. (Tr. at 922)

On December 27, 2016, Claimant underwent an MRI of his lumbar spine. (Tr. at 867-870) The impression was moderate disc disease at the L5-S1. (Tr. at 928, 929) Because the results showed bulging discs and nerve impingements that could be causing his pain, a referral was made to Dr. Ignatiadis. (Tr. at 870) On January 2, 2017, Claimant reported to CAMC AMB Primary Care Nitro for the results of his MRI. (Tr. at 1150-1152) He stated that he continued to have pain down both legs, slightly worse on the left; he reported that the diclofenac helped his shoulder pain, but not his back pain, and also that the Neurontin slightly decreased the numbness in his feet. (Tr. at 1151) He also complained of neck pain, being severe at times, that radiated across his shoulders and he reported frequent tingling in hands; he denied weakness in his upper extremities. (Id.) Joanna Stover, PA-C assessed Claimant with bronchitis, anxiety, lumbar nerve root impingement, and cervical pain and continued his current medications. (Id.)

On January 3, 2017, Claimant underwent an MRI of his cervical spine which revealed: no

acute fractures, dislocations, or other acute bony abnormalities; mild straightening of the cervical spine without prevertebral soft tissue swelling; and mild degenerative disease, greatest C5-C6, with minimal scoliosis. (Tr. at 927)

On January 23, 3017, Claimant returned to Dr. Robie for refills and reported he could not tell much difference with the Zoloft he had been taking for over a month. (Tr. at 1154)

On January 24, 2017, Claimant underwent another MRI of his lumbar spine; there were no changes from the December 27, 2016 MRI. (Tr. at 926)

On February 8, 2017, Claimant returned to Dr. Robie and requested a referral to pain management. (Tr. at 1157-1158) Claimant also reported that Zoloft helped, but experienced ringing of the ears and that Vistaril was really helping, but it wore off quickly; he also complained of a new problem of diarrhea. (Id.)

On February 23, 2017, Claimant attended a neurosurgical consultation with Dr. Ignatiadis, who previously treated his back in 2007. (Tr. at 933) Claimant rated his pain at 8/10, but he walked without assistance and could perform his activities of daily living independently. (Tr. at 933-934) On examination, Claimant was healthy, well-groomed, and in no acute distress. (Tr. at 934) He had full 5/5 strength in his upper and lower extremities, normal muscle tone and bulk, intact sensation, normal gait, and a negative straight leg raise test. (Tr. at 935) Dr. Ignatiadis found "nothing to suggest major recurrence of a disc herniation to necessitate surgical intervention" and recommended conservative treatment and weight loss. (Id.)

On March 21, 2017, Claimant began pain management with Pramod Kumar, M.D., who prescribed medication and recommended lumbar injections and physical therapy. (Tr. at 1164-1165) Dr. Kumar noted that due to his pain, Claimant "has significant difficulty performing

13

activities of daily living/occupational activities/leisure activities." (Tr. at 1164) Claimant attended physical therapy from March 24, 2017 to May 15, 2017 and although he reported some improvement, his pain remained at 8/10 or 9/10. (Tr. at 1168-1202)

Claimant underwent updated diagnostic tests in 2017. On June 30, 2017, he underwent an electromyography and nerve conduction study which was consistent with lumbar radiculopathy. (Tr. at 1206-1207) An August 24, 2017 lumbar MRI showed disc narrowing at L5/S1 with scar tissue. (Tr. at 1203)

Dr. Kumar saw Claimant again on October 30, 2017 and noted Claimant's history consisted of pain rated 10/10 in his lower back, that Claimant described as constant, aching, sharp, burning, throbbing, shooting, tingling, and numb in nature. (Tr. at 1323) He complained that this pain radiates to his lower extremities, along with pin and needle sensations in the left foot and tingling and numbness in both feet with occasional incontinence of bowel/bladder. (Id.) It was also noted Claimant completed physical therapy and it did not help his pain or other symptoms, however current medications helped with the pain. (Tr. at 1323-1324) The plan was to continue home exercises and increase his Tramadol. (Tr. at 1327)

On January 2, 2018, Claimant received a lumbar epidural steroid injection (Tr. at 1390-1391), and he reported to Dr. Kumar that it gave him "up to 80% pain relief" but the effects waned a little after two weeks, but it still helped (Tr. at 1384).

On February 23, 2018, Claimant underwent an MRI of his cervical spine which revealed minimal annular disc bulges C4-C7, with no other significant degenerative disease. (Tr. at 1417)

Claimant initiated treatment with Michael Istfan, M.D., of The Rheumatology Group on March 14, 2018; Dr. Istfan noted that joint pain was likely on the basis of osteoarthritis, and also

localized inflammation involving the hips. (Tr. at 1306, 1426) Claimant had mild limitations in his cervical spine, tenderness in his lumbar spine with mild limitations in bending, cool shoulders with normal range of motion, no wrist abnormalities, small nodes on his hands with tenderness in the PIP joint but normal range of motion, and pain in his hips. (Tr. at 1424, 1428) Dr. Istfan recommended glucosamine supplements, weight loss, and injections. (Tr. at 1423)

April 2, 2018 x-rays of Claimant's lumbosacral spine did not show fractures and was otherwise normal, and an x-ray of his pelvis indicated probable left-sided trochanteric bursitis, but no fracture and was otherwise normal. (Tr. at 1310-1311)

On April 17, 2018, Claimant returned to Dr. Istfan and reported that he had some improvement since starting Flurbiprofen, but continued to have discomfort in his back, worse with activity. (Tr. at 1424) Upon examination, Claimant's cervical spine had mild limitations, no tenderness, and that his lumbar spine was tender and in the SI regions, with mild limitation of forward bending, but normal lateral bending; he noted Claimant's shoulders were cool and rotate well, with no tenderness; Claimant's wrists had no tenderness, no synovitis, with a stable range of motion; his hands had small Heberden's and Bouchard's nodes, no synovitis, no tenderness, with a stable range of motion; Claimant's hips rotated well but with tender greater trochanters; his knees were cool without effusion or laxity, with no tenderness; and the ankles showed no synovitis, no tenderness, with stable range of motion. (Id.) Dr. Istfan injected both Claimant's hips with Depo Medrol which he tolerated well. (Tr. at 1423)

On June 4, 2018, Claimant sought treatment for numbness and pain from neurologist and neurophysiologist, Robert L. Lewis, II, M.D. (Tr. at 1475-1488) Dr. Lewis ordered additional labs for the numbness and weakness as the exam raised concerns for left S1 radiculopathy. (Tr. at 1487)

15

On July 16, 2018, Dr. Lewis ordered an MRI brain and thoracic spine. (Tr. at 1519-1520) On July 30, 2018, the thoracic spine MRI revealed very shallow disc bulges at T8/10 and T9/10; the brain MRI showed no acute abnormality. (Tr. at 1473-1474)

**<u>The Administrative Hearing</u>**

<u>Claimant Testimony:</u>

Claimant stated that he had gained 50 pounds in the last year due to his medication, gabapentin. (Tr. at 55) He takes Neurontin, tramadol, Flexeril and Flurbiprofen; he used to take pain medication but it made him feel worse so he no longer takes it. (Tr. at 62-63)

He stated that if he drove at all, it was just to move one vehicle out of the way in the driveway; his father drives him around and drove him to the hearing. (Tr. at 55-56) He lives in the basement of his parents' home and that his youngest daughter stays with him every other week. (Tr. at 56) His ex-wife drops their daughter off or his parents will go pick her up for the weekly visits. (Tr. at 57)

Claimant testified that as a truck driver, he would have to lift approximately 50 pounds; he quit working as a truck driver in June 2015 due to his re-herniation getting bigger and he was in excruciating pain at the end of the day and could barely walk; he could not use the bathroom independently or put his shoes on. (Tr. at 59) He did not file a workers' compensation claim. (<u>Id</u>.) He testified that he can't work because of his back and leg pain and he feels hopeless because injections don't help. (Tr. at 60-61)

Since 2015, Claimant has used a cane continuously, although it was not prescribed by a doctor. (Tr. at 59-60) He estimated that he can stand in one place without the cane for about 15 minutes to an hour before his legs give out and cause him to fall. (Tr. at 60, 68) He stated that he

16

falls once a week or more. (Tr. at 60) He stated that he could sit for an hour, but he has to change positions. (Tr. at 68-69) He testified that his back pain goes from his lower back all the way down to his toes and that his left leg is the worst; he stated that his left calf muscles and left buttock have gotten smaller. (Tr. at 61) Claimant testified that he also experiences numbness, tingling and burning in his legs. (Id.) He also has problems controlling his bowels. (Tr. at 62)

Although Claimant told his doctors about his bowel issues, they have not suggested anything, however, pain management was suggested by his doctors and he was looking for another opinion because the injections were making him feel worse. (Id.) For his back issues, his pain management doctor told him they will only get worse, but he is waiting on a second opinion from a surgeon. (Tr. at 66)

Within the last year, Claimant developed bursitis in his hips that makes it hard to sleep on his sides; when he sleeps on his back, his legs go numb. (Tr. at 63) He stated he has arthritis in all his joints, but it's worse in his back. (Id.) Claimant testified that gabapentin helps him more than anything, and although the Trazodone helps him sleep some, he still gets up every two hours and he doesn't sleep well. (Tr. at 63-64)

Claimant testified that in addition to his pain, his depression and severe anxiety also prevent him from working; he recently started seeing a new psychiatrist and will go see her when his anxiety or depression gets worse. (Tr. at 64) He stated that when he has an anxiety attack, it "hits" him hard where he can't do anything; he can't breath and he gets unfocused and he doesn't know what causes it although he's had this problem a long time. (Tr. at 65) He stated he gets these attacks every day until his medication kicks in, and they last about thirty minutes. (Id.) Claimant also testified that he has memory and concentration problems. (Tr. at 65-66)

17

Claimant testified that he has several other medical problems. He has pain in his neck due to a bulging disc that feels like "grinding and crunching" and causes his ears and head to hurt. (Tr. at 67) He testified that he gets headaches often. (Id.) He testified that when he raises his arms above his head, his arms go numb from his shoulders. (Tr. at 68) He stated he has constant numbness and tingling in his hands that make it difficult to pick things up because he can't grip. (Id.) He estimated that he might not be able to carry 10 pounds and that he would have trouble carrying a gallon of milk. (Tr. at 69)

To alleviate his back pain, he lays flat on his back; he does not elevate his legs. (Tr. at 70) He had physical therapy but it didn't do any good. (Id.) He can't use a TENS unit because it hurts too much. (Tr. at 70-71) Cold compresses and heating pads don't help with his pain. (Tr. at 71)

Claimant described a typical day for him is when he wakes up, he'll go to the bathroom and then lie back down; he doesn't do much but feel hopeless and helpless, but he will take his medicine and try to eat something. (Id.) Claimant can fix simple meals such as making a sandwich or snacks. (Tr. at 72) Claimant's oldest daughter helps him with household chores. (Id.) He reads a lot and participates in support groups on Facebook; sometimes he goes outside to sit for a little while. (Tr. at 73) He watches TV some, but he can't focus on one show, he changes the channels a lot. (Id.) He used to enjoy fishing, but he can't do any walking, he has to sit until he can't sit anymore due to pain; he's frustrated because he would like to do more but can't due to his excruciating pain. (Tr. at 74, 75-76) He has a small dog that belongs to his youngest daughter; his daughter and mother feeds it. (Tr. at 75) Contrary to what a medical record mentioned, Claimant denied that he was caring for his parents, that his father had dementia, or that he took care of his parents' finances, medications or getting them to and from physician appointments; he did help

his parents with bills. (Tr. at 80-81) Claimant testified that although there was a time that he had issues with methamphetamine and marijuana use, he has been clean since 2016. (Tr. at 82-83)

Claimant testified that during an eight-hour workday, he would have to lay down every 15 minutes for about three hours before he could return to work. (Tr. at 79)

Vocational Expert ("VE") Testimony:

The impartial VE testified during the hearing with no objection from Claimant's attorney. (Tr. at 84) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform light work, except he can sit for six hours, stand for four hours, and walk for four hours during an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; can make frequent use of hand and foot controls; can frequently handle and finger bilaterally; can occasionally reach overhead bilaterally; can frequently push and pull bilaterally with both the upper and lower extremities; makes use of a cane to ambulate; and must avoid frequent exposure to temperature extremes, dust, fumes, odors, gases, and other pulmonary irritants, unprotected heights, and moving mechanical parts. (Tr. at 85, 86-87)

The VE testified that such a person could not perform Claimant's past relevant work, but could make a vocational adjustment to a significant number of light, unskilled jobs existing in the national economy, such as the representative examples of price marker, package labeler, and routing clerk (Tr. at 85-86, 87), and at the sedentary exertional level, the individual could make a vocational adjustment to other jobs, such as table worker, sorter, and final assembler (Tr. at 86, 87).

In response to questions from Claimant's attorney, the VE testified that if the individual

19

were physically unable to climb any stairs at all, never walk over 25 yards, and never lift anything over 10 pounds, the sedentary work would still remain. (Tr. at 89)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As an initial matter, Claimant has taken the position the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (ECF No. 15 at 19) However, no such presumption exists. Salmons v. Astrue, No. 3:09-cv-01268, 2011 WL 612866, at *16 (S.D.W. Va. Feb. 11, 2011) (Eifert, M.J.); see Preston v. Heckler, 769 F.2d 988, 990 n.* (4th Cir. 1985) ("The

ultimate burden to prove disability lies on the claimant."). Claimant offers nothing in support of this argument. Accordingly, to the extent the ALJ had a duty to rebut the presumption of disability, Claimant's argument lacks merit.

The Evaluation of Opinion Evidence:

>The Regulations provide the definition for "medical opinions":

>Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." Id. §§ 404.1527(b), 416.927(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. §§ 404.1527(c), 416.927(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. §§ 404.1527(d)(2), 416.927(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3).

Claimant has explicitly stated that the ALJ "disregarded his medical providers opinion and substituted his own opinion" (ECF No. 15 at 15) and indicated that the ALJ did not consider Dr. Kumar's notations documenting Claimant's pain (Id. at 16). Claimant refers to several exhibits found in the transcript: Tr. at 153, 159, 164, 169, 215, 1164, 1327, 1339. (Id.) The undersigned notes that the first five of the referenced records (Tr. at 153, 159, 164, 169, 215) were not submitted to the ALJ for consideration, but were submitted to the Appeals Council several months after the ALJ issued his decision. Additionally, the Appeals Council found that none of the additional evidence showed a reasonable probability that it would change the outcome, and further found that some of the evidence submitted was not related to the period at issue. (Tr. at 2) Claimant does not take issue with the Appeal Council's findings to that extent and has not been raised as grounds in the appeal before this Court.

With regard to the remaining three referenced records that *were* before the ALJ for his consideration (Tr. at 1164, 1327, 1339), in each of those entries the undersigned observes that Dr. Kumar noted:

> ***The patient reports*** his pain adversely affects his physical functioning, family and social relationships, mood, sleep and quality of life. The patient has significant difficulty performing activities of daily living/occupational activities/leisure activities due to pain. (***emphasis*** added)

It is significant that none of these records contain a medical opinion as defined by the Regulations.[3] To the extent that Claimant has argued Dr. Kumar's notations corroborate a disability finding, it is well known that the Regulations specifically reserve disability and work-related determinations

---

[3] As stated *supra*, Claimant also asserts that the ALJ "substituted his own opinion" for those of his treating providers but fails to identify any opinion by any of Claimant's treating providers, and fails to provide any further explanation or argument in support of this blanket statement. Nevertheless, the record contains no treating physician opinion; it appears that Claimant simply conflates diagnoses and treatment notes with opinion evidence. Accordingly, Claimant's argument to this extent lacks merit.

solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Moreover, as pointed out by the Commissioner, "a claimant's own description of his symptoms is never alone sufficient to establish functional limitations or disability" pursuant to Social Security Ruling 16-3p, 2016 WL 119029, at *2. (ECF No. 16 at 11-12) In addition, these records do not contain any statements concerning functional limitations or what Claimant "can still do despite [his] impairment" that would lend themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. §§ 404.1527, 416.927. Further, to the extent that Claimant argues the ALJ "failed to properly consider the diagnosis' [*sic*] of [Claimant's] treating physicians" (ECF No. 15 at 15), it is also well known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted). Nevertheless, as discussed *infra*, the ALJ did consider these records in rendering his decision.

As for the actual opinion evidence of record, it is noted that none of them found Claimant disabled, and significantly, the ALJ had the opportunity to review all of the evidence of record, and in particular Claimant's testimony, prior to rendering his decision. The ALJ gave "partial weight" to the medical consultants' opinions, observing that Claimant's physical condition worsened over time, "especially with regards to his postural limitations, and his need to use a cane to ambulate." (Tr. at 35, 36) The ALJ has discharged his duty pursuant to Sections 404.1527(c) and 416.927(c) and provided an adequate explanation for his conclusions that allows for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In short, the undersigned **FINDS** Claimant's contention that the ALJ failed to consider his

treating physician's "opinions", and instead substituted his own opinion, lacks merit.

The Duty to Develop the Evidence:

Claimant has also asserted, in a conclusory fashion, that this case should be remanded "to fully and fairly develop the evidence" (ECF No. 15 at 20).

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process. Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of

proof never shifts to the Secretary. . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require him to make specific inquiries into Claimant's treatment modalities or search for cumulative evidence; his duty is to obtain sufficient evidence upon which he can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

In this case, the ALJ expressly considered the medical evidence from June 2007 through July 2018[4] which included not only treatment records from his providers for his physical and

---

[4] Presumably, the ALJ considered medical evidence submitted after the administrative hearing on account of the numerous exhibits attached to the written decision: these included hospital records from CAMC Neurology dated June 4, 2018 through July 30, 2018 as well as office treatment records from The Rheumatology Group dated August 17, 2018 through September 7, 2018. (Tr. at 47) Indeed, the ALJ refers to the July 30, 2018 records that concerned an MRI of Claimant's thoracic spine (Tr. at 30, 1473) "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill, 2017 WL 2805498, at *4 (N.D.W.Va. June 28, 2017) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his

mental impairments, but also the reports of the State agency medical and psychological examiners as well as the opinion evidence provided by State agency consultants. (Tr. at 25-36) In addition, the ALJ reviewed other evidence, which included Claimant's testimony concerning his limitations from his physical and mental conditions; significantly, the ALJ acknowledged Claimant's testimony concerning his persistent pain symptoms. (Tr. at 33-35)

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision. Nevertheless, it is clear that the ALJ made numerous references throughout his decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Indeed, Claimant underwent two consultative examinations in order to develop the record: an internal medicine examination by Dr. Crennan and a mental status examination by Ms. Reynolds. In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further develop the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant has also argued in a conclusive fashion that the ALJ "disregarded" the record as it related to Claimant's back pain, failed to perform a "credibility determination", and that this matter be remanded "to resolve any inconsistencies, to utilize all the evidence in the record in making a disability judgment, and to render a correct assessment of [Claimant's] residual functional capacity." (ECF No. 15 at 17-18, 20)

---

decision." <u>Reid v. Commissioner of Social Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014) (quoting <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*).

SSR 16-3p[5] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

---

[5] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. §§ 404.1529(c)(3), 416.929(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Even a cursory review of the written decision shows that the ALJ considered Claimant's complaints of pain, subjective pain ratings, treatment, and medication for pain. (Tr. at 28-35) For instance, the ALJ initially acknowledged that Claimant has a history of lumbar laminectomy

surgery in 2007, with a reinjury in 2009, however, Claimant declined to have a second surgery. (Tr. at 25, 28, 582-592, 593-602, 603-618) Throughout the written decision, the ALJ recognized that the voluminous records as well as Claimant's own testimony supported his complaints of chronic back pain with radiculopathy in both lower extremities, including hip, neck, and shoulder pain. (Tr. at 28-31)

In addition to his review of the extensive medical record, described in greater detail, *supra*, some of the ALJ's more significant notations from the relevant period concerning Claimant's back issues included the following: during the consultative examination with Dr. Crennan, Claimant "showed a normal gait, no hand-held assistive device, and mild tenderness over the lumbar spine to palpation"; "straight leg raise was negative sitting and supine" (Tr. at 29, 633); an MRI of the lumbar spine taken on January 2, 2017 indicated it was "stable since December 27, 2016 MRI, with no abnormal enhancement" (Tr. at 29, 926, 931); a February 3, 2017 treatment note from Dr. Ignatiadis indicated Claimant "walked in without assistance", he "had a normal cadence and arm swing", with negative straight leg raise and hip rotation bilaterally, and that Dr. Ignatiadis found "nothing to suggest major recurrent disc herniation to necessitate surgery, specifically taking into account that his symptoms had been present for some time" (Tr. at 29, 933-935); Claimant attended physical therapy from March 24, 2017 to May 15, 2017 and "claimant reported immediate improvement following therapy" (Tr. at 29-30, 1169, 1193, 1208-1241); an examination on October 30, 2017 showed Claimant had "mildly decreased range of motion of the spine; decreased sensation over the left L4 and L5 dermatomes", yet Claimant "was able to walk on his heels and toes, and his gait was within normal limits, with good balance and coordination" (Tr. at 30, 1326); an April 2, 2018 MRI of the lumbo-sacral spine showed no evidence of fracture, normal bone

density and alignment, and advanced disc space narrowing at L5/S1 (Tr. at 30, 1310, 1414); in June 2018 Claimant "reported at the pain center that his pain was worse with prolonged sitting, but better with movement" and he was "taking Ibuprofen" (Tr. at 30, 1437); and finally, a July 30, 2018 MRI of the thoracic spine "showed very shallow disc bulges at T8/9 and T9/10 with no acute abnormalities" (Tr. at 30, 1473).

With regard to Claimant's allegations of right arm and shoulder pain, the ALJ noted the following: Dr. Crennan's report "showed tenderness over the right ACL joint and distal clavicle" and "shoulder examination revealed pain with range of motion of the right shoulder" and "[t]here was audible popping with evaluation of abduction of the right shoulder and a grinding sensation during testing" (Tr. at 30); an x-ray of the right shoulder on November 17, 2016 showed "no acute fracture, normal alignment, and the ACL joint was intact" (Tr. at 30, 684, 922); an April 2, 2018[6] examination of the shoulders "showed them to be cool, with normal range of motion, no effusion or tenderness" and "rotation of the shoulders was done well without tenderness" (Tr. at 31, 1428, 1424)

Concerning Claimant's allegations of neck pain, the ALJ noted the following: an x-ray of the cervical spine on January 3, 2017 "showed no acute fractures, dislocations, or other acute bony abnormalities" (Tr. at 30-31, 825, 927) but there was "some degenerative changes" and "mild straightening suggesting a lot of muscle spasm" (Tr. at 31, 809); a February 23, 2018 MRI of the cervical spine "showed minimal annular disc bulges at C4 through C7, but no other significant degenerative disease" (Tr. at 31, 1284) and during an examination by Dr. Istfan on April 17, 2018,

---

[6] The record is actually dated March 14, 2018, however, Dr. Istfan signed it electronically on April 2, 2018. A treatment note dated April 17, 2018 contained the same findings.

the cervical spine "showed mild limitations without tenderness" (Tr. at 31, 1423). The ALJ further noted that Dr. Istfan determined that Claimant's joint pain "was likely caused by osteoarthritis" (Tr. at 31, 1306)

Regarding Claimant's allegations of hip pain, the ALJ observed a treatment note dated March 14, 2018 from Dr. Istfan that reported Claimant "had features of localized inflammation involving the hips, but examination findings did not suggest an inflammatory joint disease" (Tr. at 31, 1306) and at a subsequent appointment on April 17, 2018, Dr. Istfan noted the "hips had tenderness of the trochanters on examination" (Tr. at 31, 1424) and that Claimant agreed to injections to both hips for pain relief on July 17, 2018 (Tr. at 1470).[7]

To the extent that Claimant contends that the ALJ "failed to discuss how the numbness in [Claimant's] hands which involved all fingers would erode the jobs available to him in the sedentary and light categories" (ECF No. 15 at 16), this argument lacks merit. The ALJ noted that Dr. Crennan's September 2016 examination revealed that Claimant "had tenderness over the DIP joint of the left fourth finger with no range of motion of this joint. He was able to make a fist bilaterally, with the tip of the fourth finger unable to reach the palm, but no evidence of diminished fine finger with either hand. Range of motion of the joints of both fingers was normal." (Tr. at 30) The ALJ further observed that on March 14, 2018, an examination by Dr. Istfan also indicated that Claimant's hands "showed small Heberden's and Bouchard's nodes, but no synovitis, and tenderness of the PIP joints and normal range of motion" (Tr. at 31, 1428)

Following his discussion of the medical evidence, the ALJ gave considerable attention to Claimant's testimony, *supra*, with numerous acknowledgements to Claimant's allegations of

---

[7] Dr. Istfan also noted that Claimant's hips "rotate well" during an examination in April 2018. (Tr. at 1424)

chronic pain, some highlights included: "He feels he cannot work because of his back and leg problems, and severe pain on a daily basis"; "the pain in his back is located midway of the back, radiating all the way to the toes; "left leg pain is worse than the right"; "no reflex in the legs and the muscles have shrunk": "left leg causes him to fall due to numbness or tingling"; he "used to take pain medications, but not anymore"; the pain in his hips "is different from the low back and makes it difficult for him to sleep on his side"; "[h]e does not sleep well due to the pain"; "[a]s for sitting, the claimant testified he could probably sit longer than an hour, but would then need to stand for about 15 minutes"; [h]e could stand, with or without a cane, for about 15 minutes but would definitely need to sit after 15 minutes when not using the cane"; "[h]e would need to take a break to lie down about every 15 minutes out of an eight-hour workday" and then he "would need to lie in bed for about three hours"; he can walk about 25 feet, "but would need to stop and bend over to relieve the pain"; "[m]ost of the time, he finds himself needing to sit"; "he is constantly uncomfortable"; he "estimated he could lift 10 pounds but he could not carry that weight due to problems with his back"; "lying flat on his back" is a better position for him; physical therapy "did not do any good"; he does not use a TENS unit, cold compresses or a heating pad to relieve the pain, but he does use medication; he cannot watch a television program from beginning to end due to pain; the pain in his neck is different from his low back pain and makes his ears hurt and headache; he takes no medication for headache; raising his arms above his head causes numbness; "[t]he numbness and tingling in his hands is constant"; "[h]e has issues picking up things"; "[h]e cannot squeeze well and his arms shake and quiver"; and he enjoys fishing, but cannot stay long because of pain. (Tr. at 34-35)

Next, the ALJ performed the requisite credibility/consistency analysis endorsed by Craig

v. Chater, 76 F.3d 585, 594 (4th Cir. 1995). (Tr. at 35) The ALJ determined that "[a]s for the

claimant's statements about the intensity, persistence, and limiting effects of his [] symptoms, they

are inconsistent." (Id.) The ALJ then provided the following:

> In the claimant's function report, he states he does laundry, sweeps the floors and
> washes dishes (Exhibit 5E)[8]. At the psychological consultative examination, he
> reported he did not cook or do laundry (Exhibit 10F)[9]. He further reported to the
> psychological consultative examiner that he tries to help his parents (Exhibit 10F).
> In another medical report, he reported he helps care for his parents because his
> father has dementia and he falls a lot (Exhibit 31F/10)[10]. He takes care of their
> finances, medications, and getting them to and from doctor's appointments. At the
> hearing, he testified he did not know why these doctors wrote this down because
> this is not what he said. He testified he never told the doctor in March 2018 that he
> cares for his elderly parents and his father has dementia (Exhibit 31F/10). His father
> brought him to the hearing a person with dementia could not do that. His father
> does fall, but not more than him. As far as taking care of his parents finances, he
> testified he has only helped them once or twice and did not remember ever taking
> them to any of their appointments. As for their medications, they take care of their
> own. He reported to the psychological consultative examiner that he does not drive
> because "I do not have a car", but he reported in the function report that he does
> drive (Exhibits 5E, 10F). He testified, however, that the only driving he does now
> is to move the vehicles around the driveway. He has trouble driving because his
> feet and legs go numb, so his dad drives him places. Yet, again, he reported in a
> medical report that his father has dementia and falls frequently (Exhibit 31F/10).

(Id.) It is well known that "an ALJ is not required to discuss all the evidence submitted, and an

ALJ's failure to cite specific evidence does not indicate that it was not considered." See Manigo

v. Colvin, 2015 WL 74954, at *5 (D.S.C. Jan. 6, 2015) (quoting Craig v. Apfel, 212 F.3d 433, 436

(8th Cir. 2000)). Given the conflicting evidence consisting of Claimant's allegations of pain and

other symptoms with the objective and other evidence of record, the ALJ is solely responsible for

---

[8] This is the Function Report submitted on September 16, 2016. (Tr. at 476-483)

[9] This Exhibit concerns the December 20, 2016 mental status examination report submitted by Mareda Reynolds,
M.A. (Tr. at 723-727)

[10] This citation concerns a March 20, 2018 treatment note by Brandon Lilly, M.D., with Marshall Psychiatry and
Behavioral Medicine following a referral from Claimant's primary care provider at Nitro Primary Care. (Tr. at 1373)

resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). In this case, it appears that the ALJ gave scrupulous attention to the evidence, including Claimant's allegations of pain, what helped his pain, and what did not relieve his pain, as well as a review of the conflicting medical and other evidence requiring some reconciliation.

Accordingly, the undersigned **FINDS** that Claimant's arguments that the ALJ disregarded the record concerning Claimant's back pain and failed to evaluate his symptoms against the evidence of record lack merit, the undersigned further **FINDS** that the ALJ's assessment of Claimant's subjective complaints is supported by the substantial evidence.

The Combination of Impairments:

Claimant contends that the combination of his impairments "produce[s] a level of pain" that effectively renders Claimant disabled (ECF No. 15 at 19). Claimant offers nothing in support of this argument except that "[t]he weight and sheer volume of the evidence supports [Claimant's] testimony and the Judge blatantly discounts that evidence" mandates reversal. (Id. at 19-20) These arguments lack merit. Although Claimant contends that the medical records indicated that he suffered from numerous impairments, he does not specify which impairment specifically meets or equals any Listing. As noted *supra*, Claimant bears the burden of proving he has an impairment or combination of impairments that meets or medically equals the severity of Listing requirements. See Bowen, 482 U.S. at 146, n.5.

The Regulations provide:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis

34

of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. §§ 404.1523(c), 416.923(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. §§ 404.1525(a), 416.923(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

As noted supra, at the third step in the sequential evaluation process, the ALJ explicitly found that none of Claimant's impairments, singly or in combination, met any of the Listings' requirements. (Tr. at 25) Absent any evidence to the contrary, a reviewing court must take the

ALJ's findings at his word. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). Indeed, this Court has previously determined that an ALJ properly considers impairments in combination where he discusses each impairment separately and finds that the claimant's impairments, when considered together, did not prevent him from performing basic work activities. See, e.g., Wiseman v. Colvin, 2015 WL 9075457, at *19 (S.D.W.Va. Nov. 24, 2015), report and recommendation adopted by, 2015 WL 9008899 (S.D.W.Va. Dec. 15, 2015).

In this case, the ALJ evaluated Claimant's degenerative disc disease of the lumbar spine with radiculopathy under Listing 1.04 and noted that the August 24, 2017 MRI of the lumbar spine showed no evidence of compromise of the nerve root (Tr. at 26, 1203, 1324, 1392) and noted the same for his cervical degenerative disc disease (Tr. at 26, 825, 927)[11]. The ALJ also noted that Claimant's degenerative joint disease, "defined as osteoarthritis and trochanteric bursitis of the hips" also did not meet Listing requirements under 1.00, specifically 1.02. (Tr. at 26) The ALJ found that the evidence did not show "evidence of any gross anatomic deformity of any joint on imaging records or on observation during examinations." (Tr. at 26, 621, 633, 684, 723, 809, 825, 922, 927, 1284, 1306, 1318, 1423-1424, 1428, 1470)[12]

With regard to Claimant's mental impairments, after having considered them singly and in combination, the ALJ found that the medical evidence along with the other evidence of record, which included Claimant's own statements and testimony, did not meet or medically equal Listing

---

[11] It is noted that the cervical spine x-rays are dated January 2017.

[12] In support of this finding, the ALJ referred to: a pain management treatment note dated April 6, 2016; the September 19, 2016 consultative examination report documenting Dr. Crennan's findings; a November 17, 2016 x-ray of Claimant's right shoulder; the December 20, 2016 mental status examination report documenting Ms. Reynolds's observations; the January 3, 2017 cervical spine x-ray; the February 23, 2018 cervical MRI; March 14, 2018, April 17, 2018 and July 17, 2018 treatment notes from Dr. Istfan, respectively.

requirements: in understanding, remembering, or applying information, Claimant had only mild limitations (Tr. at 26, 476-483, 1364-1377, 632-639, 723-727); in interacting with others, Claimant had only moderate limitations (Id.); in his ability to concentrate, persist or maintain pace, Claimant had only moderate limitations (Tr. at 26, 476-483, 1364-1377); and in his ability to adapt or manage himself, Claimant had only mild limitations (Tr. at 27, 476-483, 632-639, 723-727).[13] Ultimately, the ALJ determined that Claimant's mental impairments failed to satisfy either "paragraph B" or "paragraph C" criteria, observing that "it is clear from the record that the claimant is able to do more than he states in the evidence of record or has testified." (Tr. at 27)

Accordingly, the undersigned **FINDS** that Claimant's argument that his impairments, singly or combined, met Listing requirements lacks merit, the undersigned further **FINDS** that the ALJ's step three determination is supported by the substantial evidence.

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 15), **GRANT** the Defendant's

---

[13] The ALJ based his findings on: Claimant's Function Report dated September 16, 2016; office treatment records from Marshall Psychiatry dated March 20, 2018 to March 22, 2018; the consultative examination report provided by Joan Crennan, M.D., dated September 27, 2016; and the consultative examination report provided by Mareda Reynolds, M.A., dated December 20, 2016.

request to affirm the decision below (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 13, 2020.



Omar J. Aboulhosn
United States Magistrate Judge